IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

FRED EUGENE BAILEY,                          1:14-CV-00749-BR

       Plaintiff,                            OPINION AND ORDER

v.

CAROLYN W. COLVIN, Acting
Commissioner, Social Security
Administration,

       Defendant.

KATHRYN TASSINARI
ROBERT A. BARON
474 Willamette Street, Suite 200
Eugene, OR 97401
(413) 686-1969

       Attorneys for Plaintiff

S. AMANDA MARSHALL
United States Attorney
RONALD K. SILVER
Assistant United States Attorney
1000 S.W. Third Avenue, Suite 600
Portland, OR  97204-2902
(503) 727-1044

**DAVID MORADO**
Regional Chief Counsel
**MARTHA A. BODEN**
Special Assistant United States Attorney
Office of the General Counsel
Social Security Administration
701 Fifth Avenue, Suite 2900, M/S 221A
Seattle, WA 98104-7075
(206) 615-3708

      Attorneys for Defendant

**BROWN, Judge.**

    Plaintiff Fred Eugene Bailey seeks judicial review of a final decision of the Commissioner of the Social Security Administration (SSA) in which she denied Plaintiff's application for Supplemental Security Income (SSI) under Title XVI and for Disability Insurance Benefits (DIB) under Title II of the Social Security Act.  This Court has jurisdiction to review the Commissioner's final decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

    Following a review of the record, the Court **REVERSES** the decision of the Commissioner and **REMANDS** this matter for the calculation and payment of benefits pursuant to sentence four, 42 U.S.C. § 405(g).

2 - OPINION AND ORDER

## ADMINISTRATIVE HISTORY

Plaintiff first filed applications for DIB and SSI on December 14, 2006, and alleged a disability onset date of August 25, 2005. Tr. 223.[1] The applications were denied initially and on reconsideration. Tr. 109, 120. Plaintiff requested a hearing, and an Administrative Law Judge (ALJ) held a hearing on June 24, 2009. Tr. 52. At the hearings Plaintiff was represented by an attorney. Plaintiff and a vocational expert (VE) testified. Tr. 52.

The ALJ issued a decision on November 2, 2009, in which she found Plaintiff was not disabled. Tr. 92. The Appeals Council vacated that decision, consolidated it with a subsequent claim, and remanded for further proceedings. Tr. 106. On June 14, 2012, the ALJ held a hearing on the consolidated claims. Tr. 52. On October 15, 2012, the ALJ issued a decision finding Plaintiff is not disabled. Tr. 15. On February 27, 2014, the Appeals Council denied Plaintiff's request for review, and that decision became the final decision of the Commissioner. Tr. 1. *See also Sims v. Apfel*, 530 U.S. 103 (2000).

---

[1] Citations to the official transcript of record filed by the Commissioner on January 30, 2012, are referred to as "Tr."

On May 5, 2014, Plaintiff filed a Complaint in this Court seeking review of the Commissioner's decision.

## BACKGROUND

Plaintiff was born in September, 1958, and was 46 years old on his alleged onset date of August 25, 2005.  He graduated from Gold Beach Union High School in 1977, but his transcript does not contain any record of classes taken during his tenth-grade year.  Tr. 265-66.

Plaintiff alleges disability due to a combination of mental and physical impairments.  Tr. 152-55.

## STANDARDS

The initial burden of proof rests on the claimant to establish disability.  *Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012).  To meet this burden, a claimant must demonstrate his inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The ALJ must develop the record when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence.  *McLeod v. Astrue*, 640 F.3d

4 - OPINION AND ORDER

881, 885 (9th Cir. 2011)(quoting *Mayes v. Massanari,* 276 F.3d 453, 459-60 (9th Cir. 2001)).

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g). *See also Brewes v. Comm'r of Soc. Sec. Admin.,* 682 F.3d 1157, 1161 (9th Cir. 2012). Substantial evidence is "relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *Molina,* 674 F.3d. at 1110-11 (quoting *Valentine v. Comm'r Soc. Sec. Admin.,* 574 F.3d 685, 690 (9th Cir. 2009)). It is more than a mere scintilla [of evidence] but less than a preponderance. *Id.* (citing *Valentine,* 574 F.3d at 690).

The ALJ is responsible for determining credibility, resolving conflicts in the medical evidence, and resolving ambiguities. *Vasquez v. Astrue,* 572 F.3d 586, 591 (9th Cir. 2009). The court must weigh all of the evidence whether it supports or detracts from the Commissioner's decision. *Ryan v. Comm'r of Soc. Sec.,* 528 F.3d 1194, 1198 (9th Cir. 2008). Even when the evidence is susceptible to more than one rational interpretation, the court must uphold the Commissioner's findings if they are supported by inferences reasonably drawn from the record. *Ludwig v. Astrue,* 681 F.3d 1047, 1051 (9th Cir.

2012).  The court may not substitute its judgment for that of
the Commissioner.  *Widmark v. Barnhart*, 454 F.3d 1063, 1070 (9th
Cir. 2006).

## DISABILTY EVALUATION

At Step One the claimant is not disabled if the
Commissioner determines the claimant is engaged in substantial
gainful activity.  20 C.F.R. §§ 404.1520(a)(4)(i),
416.920(a)(4)(i).  *See also Keyser v. Comm'r of Soc. Sec.*, 648
F.3d 721, 724 (9th Cir. 2011).

At Step Two the claimant is not disabled if the
Commissioner determines the claimant does not have any medically
severe impairment or combination of impairments.  20 C.F.R.
§§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  *See also Keyser*, 648
F.3d at 724.

At Step Three the claimant is disabled if the Commissioner
determines the claimant's impairments meet or equal one of the
listed impairments that the Commissioner acknowledges are so
severe as to preclude substantial gainful activity.  20 C.F.R.
§§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  *See also Keyser*,
648 F.3d at 724.  The criteria for the listed impairments, known
as Listings, are enumerated in 20 C.F.R. part 404, subpart P,
appendix 1 (Listed Impairments).

6 - OPINION AND ORDER

If the Commissioner proceeds beyond Step Three, she must assess the claimant's residual functional capacity (RFC).  The claimant's RFC is an assessment of the sustained, work-related physical and mental activities the claimant can still do on a regular and continuing basis despite his limitations.  20 C.F.R. §§ 404.1520(e), 416.920(e).  *See also* Social Security Ruling (SSR) 96-8p.  "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent schedule."  SSR 96-8p, at *1.  In other words, the Social Security Act does not require complete incapacity to be disabled.  *Taylor v. Comm'r of Soc. Sec. Admin.*, 659 F.3d 1228, 1234-35 (9th Cir. 2011)(citing *Fair v. Bowen,* 885 F.2d 597, 603 (9th Cir. 1989)).

At Step Four the claimant is not disabled if the Commissioner determines the claimant retains the RFC to perform work he has done in the past.  20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  *See also Keyser*, 648 F.3d at 724.

If the Commissioner reaches Step Five, she must determine whether the claimant is able to do any other work that exists in the national economy.  20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  *See also Keyser*, 648 F.3d at 724-25.  Here the burden shifts to the Commissioner to show a significant number of jobs exist in the national economy that the claimant can perform.  *Lockwood v. Comm'r Soc. Sec. Admin.*, 616 F.3d

1068, 1071 (9th Cir. 2010).  The Commissioner may satisfy this
burden through the testimony of a VE or by reference to the
Medical-Vocational Guidelines set forth in the regulations at 20
C.F.R. part 404, subpart P, appendix 2.  If the Commissioner
meets this burden, the claimant is not disabled.  20 C.F.R.
§§ 404.1520(g)(1), 416.920(g)(1).


## ALJ'S FINDINGS

At Step One the ALJ found Plaintiff has not engaged in
substantial gainful activity since his August 25, 2005, onset
date.  Tr. 13.

At Step Two the ALJ found Plaintiff "has the following
severe impairments:  mild mental retardation, mild degenerative
disc disease of the lumbar spine, with chronic lumbar strain;
moderate cervical degenerative disc disease as of May 2012; and
left shoulder impingement."  Tr. 13.

At Step Three the ALJ determined Plaintiff's impairments do
not equal the severity of a listed impairment.  At Step Three
the ALJ "gave particular consideration" to Listings 1.02 (major
dysfunction of a joint) and 1.04 (disorders of the spine) and
also considered Listing 12.05 (intellectual disability).
Tr. 14.

At Step Four the ALJ assessed Plaintiff's RFC and found Plaintiff could perform a range of light work with the following limitations:

> [H]e must avoid climbing ladders, ropes, or scaffolds; he must avoid working above shoulder level with the left arm; he can frequently balance and climb ramps/stairs; he can occasionally crouch, stoop, or crawl. Because of his cognitive deficits, he can understand and carry out no more than simple instructions. He should avoid workplace hazards, such as unprotected heights or large moving equipment.

Tr. 16.  The ALJ found Plaintiff cannot perform any past work.  Tr. 20.

At Step Five the ALJ found Plaintiff is capable of performing other work, including hand stuffer, table worker, and sorter.  Tr. 21.  Accordingly, the ALJ found Plaintiff is not disabled.


## THE MEDICAL EVIDENCE

### I.  Medical Evidence Resulting from Spinal Injury

In February 2004 Plaintiff sought treatment for lower-back pain after lifting a trash can at work.  Tr. 633.  Plaintiff's treating physicians were Sharon Thrall, M.D., and Allen Goodwin, M.D.  Dr. Thrall saw Plaintiff in February and March 2004; diagnosed Plaintiff with an acute lumbar strain; and

imposed a ten-pound weight limit with no twisting, lifting, or pulling heavy material.  Tr. 633.  Dr. Thrall referred Plaintiff for x-rays, an MRI, and follow-up "in the clinic."  Tr. 629.

Under the care of Dr. Goodwin Plaintiff received physical therapy and two epidural steroid injections, which did not relieve Plaintiff's pain.  Tr. 657, 662.  In September 2004 Dr. Goodwin also diagnosed Plaintiff with a mild shoulder impingement and continued Plaintiff on a ten-pound restriction with occasional bending, reaching, and twisting and no ladder climbing or overhead work.  Tr. 660.  When Dr. Goodwin reviewed Plaintiff's March 10, 2004, x-rays and March 26, 2004, MRI, he noted degenerative changes with some narrowing at the L2-L3 and L3-L4 levels with some slight disc desiccation at L5-S1 and a central disc protrusion at L4-L5 and L5-S1.  Tr. 656, 666.

In November 2004 Plaintiff was examined by Stanley Donahoo, M.D., at the request of the worker's compensation insurance carrier of Plaintiff's employer.  Tr. 668.  Dr. Donahoo noted Plaintiff "is a poor historian" and "is not a particularly articulate man."  Tr. 669.  Dr. Donahoo stated neither Plaintiff nor Plaintiff's wife had noticed Plaintiff had a subcutaneous lumbar region lipoma 2.5 by 4.5 inches across, which "can be seen from across the room," and he concluded Plaintiff's perceptual and verbal limitations are a basis for exercising

10 - OPINION AND ORDER

extra caution when determining whether Plaintiff is representing symptoms without physical sources. Tr. 669, 673. Dr. Donahoo found some of Plaintiff's pain behavior "unequivocally discordant" and noted this "negate[s] the value of a patient history and compromises the examination in part." Tr. 673, 676. Consequently, Dr. Donahoo limited his conclusions to the following: "Using objective criteria . . . [Plaintiff] could be considered to have sustained a lumbar strain, which has had time to resolve." Tr. 673.

## II. Plaintiff's Employment Records

The employment records of Plaintiff's employer at the time of the accident are consistent with Plaintiff's medical records related to his reported injury. The employment records show Plaintiff's pain continued to interfere with his work, Plaintiff departed early from a shift because of back and shoulder pain in September 2004, and Plaintiff missed a shift on an hour's notice in December 2004. Tr. 341, 363. The employment records also show Plaintiff displayed exaggerated pain behaviors such as reporting pain after rolling silverware and reporting concern about lifting a pair of printer ink cartridges. Tr. 352. Plaintiff's behavior, however, was not always consistent with his reported symptoms; for example, Plaintiff reported riding a

bicycle to work and once climbed onto a counter rather than asking for help.  Tr. 348, 352.

Plaintiff's employer terminated his employment on August 25, 2005.  According to a written recording of the general manager's conversations with Plaintiff, Plaintiff went home early on August 24, 2005, after reporting that his left side had gone numb.  The next day Plaintiff said he didn't want to go to the doctor because the doctor had asked about payment up front and had told Plaintiff that he would have to pay for his care if the worker's compensation claim was denied. Tr. 336-38.  The General Manager reports she struggled to explain to Plaintiff why worker's compensation would cover it "if he gets hurt but not necessarily if he hurts."  Tr. 334-38. Later that day Plaintiff was sent home to "think about his attitude" after he suggested he might fall down and injure himself, and they would have to pay for his treatment.  He was subsequently discharged.  Tr. 334-38.

Also in Plaintiff's employment records is a letter received by Plaintiff's employer from the State of Oregon recording an August 2002 determination by the State of Oregon that Plaintiff had "willfully made a misrepresentation and failed to report a material fact to obtain benefits":  Specifically, Plaintiff had underreported his earnings in an application for unemployment

insurance benefits.  Tr. 395-97.

### III. Plaintiff's History of Emergency Room Visits for Chest Pain

In addition to the course of treatment for his workplace
back injury, Plaintiff has presented several times for
emergency-room care with chest pain, left-side body pain, or
similar urgent symptoms.  He first presented to Chris Jannelli,
M.D., at Mercy Medical Center on September 20, 2004, reporting
chest pain, but he later reported the chest pain had disappeared
and that he was experiencing paresthesia on his left side.
Tr. 508.  After multiple tests regarding urgent heart dangers
came back clear, Dr. Jannelli discharged Plaintiff.  Tr. 507-13.
Dr. Jannelli described Plaintiff as "a very poor historian" and
as "very vague in describing his symptoms."  Tr. 508.

Plaintiff presented a second time at Mercy Medical Center
for emergency-room care on January 29, 2006.  Plaintiff
initially complained of pain in his chest with nausea and
weakness.  Tr. 504.  Questioned by Jennifer Soyke, M.D., about
the chest pain that he had reported to the nurse, Plaintiff
changed his chief complaint to pain in his lumbar back,
described feeling bad all over, reported he fell, and then
stated he had diffuse chest pain that he described as a "poking
type pain."  Tr. 504.  Dr. Soyke reported Plaintiff's blood
pressure was initially 205/117, but it "came down considerably

[to 103/70] after treatment of his pain with no other
intervention." Tr. 504-05. Dr. Soyke reviewed a "prior x-ray
and MRI" (apparently the March 10, 2004, x-ray and the March 26,
2004, MRI) and diagnosed Plaintiff with acute lumbar strain and
degenerative joint disease of the spine. Tr. 505.

Plaintiff presented a third time at Mercy Medical Center
for emergency-room care on August 12, 2008. He described having
chest pain off and on since the previous afternoon and reported
numbness on his left side and then his whole body. Tr. 495-502.
After multiple tests he was discharged with instructions to
return if his chest pain changed in character. Tr. 497.

Plaintiff presented a fourth time at the emergency room of
Mercy Medical Center on November 11, 2008, describing symptoms
of dizziness, nausea, headache, high blood pressure, left-side
chest pain, and left arm cramps. Tr. 491. Plaintiff was
treated with Meclizine, an anti-nausea medication; his blood
pressure decreased from 194/97 to 167/105; and he was discharged
with prescriptions for medication to treat high blood pressure.
Tr. 492.

Plaintiff made two additional visits to the emergency room
at Providence Medford Medical Center on February 20, 2009, and
March 1, 2010. Tr. 585-87, 705-07. His records from the first

visit list his initial chief complaint as left-side body pain
and numbness and note Plaintiff was a "poor historian."
Tr. 585.  His records from the second visit indicate he
presented describing symptoms of chest pain and also sharp pain
that traveled around.  Tr. 705.  At both visits Plaintiff's
symptoms included bradycardia, and Plaintiff received, among
other tests, a chest x-ray and an EKG.  Ultimately Plaintiff was
discharged to walk home.  Tr. 587, 707.

## IV.  Ongoing Evaluation of Plaintiff's Physical Impairment

Plaintiff was examined by Timothy Fernstrom, D.O., on
February 17, 2007.  Tr. 469.  Dr. Fernstrom noted Plaintiff
reported being a "slow learner," which Dr. Fernstrom regarded as
warranting follow-up from a psychological specialist.  Tr. 469,
472.  As to Plaintiff's physical abilities, Dr. Fernstrom
concluded:

> I would not expect that the claimant would
> be able to stand and walk more than 4-6
> hours during an eight-hour workday . . .  I
> would not expect him to be able to sit for
> more than two hours during an eight-hour
> workday and this would be with several
> breaks.  I would not expect the claimant to
> be able to lift any amount of weight.  He
> would not be able to perform a job where
> bending, stooping, or crouching are a part
> of the job.

Tr. 472.

In January 2009 Kurt Brewster, M.D., examined Plaintiff and
noted he walked with an antalgic gait.  Tr. 521.  He noted some
of Plaintiff's reports of back pain were not reasonable as he
reported pain in tests that did not involve muscles of the low
back.  Tr. 521.  Dr. Brewster listed the medical records he had
available for review, which included "only a single note" about
Plaintiff's back injury from Dr. Thrall and some medical records
from emergency-room visits where Plaintiff was tested and
treated for chest pain.  Tr. 517-18.  Without the benefit of
seeing Plaintiff's back-pain treatment records, Dr. Brewster
concluded Plaintiff could occasionally lift and carry up to 100
pounds and occasionally climb ladders and scaffolds.  Tr. 530.

On February 11, 2009, Plaintiff was examined by Robin
Rose, M.D.  Tr. 535.  Dr. Rose stated Plaintiff walked with a
somewhat unsteady gait and noted lumbar and cervical
paravertebral muscle spasms, tenderness to palpation with stiff
tissue texture, and some crepitus especially in the neck.
Tr. 538-39, 541.  Dr. Rose noted Plaintiff was disheveled, wore
very soiled clothing, and had a flat affect.  Tr. 541.  Dr. Rose
diagnosed Plaintiff with, among other things, cervical flexion
deformity and lumbar degenerative disc disease.  Tr. 541.  She
stated Plaintiff could sit for four hours with breaks every
thirty minutes to change position.  Tr. 542.  She also concluded

Plaintiff could lift or carry 10 pounds frequently and 20 pounds
occasionally, but he could not reliably balance or stoop.
Tr. 542.

In March 2009 imaging studies of Plaintiff's back and
shoulder showed moderate degenerative disc disease at C5-C6 and
osseous bridges at his coracoclavicular joint.  Tr. 544-45.
Additional radiographs of the lumbar spine on April 8, 2009,
supported conclusions of degenerative changes throughout the
lumbar spine.  Tr. 583.

In June 2009 Plaintiff was diagnosed by treating physician
Donald Robertson, D.O., with, among other things, chronic left
low-back pain.  Tr. 613.

In December 2010 Plaintiff was again examined by Dr. Rose
with the benefit of Plaintiff's mental evaluation by Dr. Col, a
large set of Plaintiff's emergency-room records, and records
from Drs. Thrall and Goodwin.  Tr. 688.  Dr. Rose noted
Plaintiff had "notable intellectual difficulty" and presented
with "simple, slow mentation" and "peculiar affect."  Tr. 690,
693.  Plaintiff's left shoulder was restricted and frozen.
Tr. 695.  Dr. Rose stated:  "[C]learly the issue has been
symptoms in excess of physical findings in a developmentally
delayed adult who was challenged to explain his problems."
Tr. 697.

17 - OPINION AND ORDER

Dr. Rose concluded Plaintiff could be expected to stand and to walk for three to four hours in a shift and could sit for four hours with breaks every thirty minutes to change position. Tr. 697.  Dr. Rose stated Plaintiff could lift or carry 10 pounds frequently and 20 pounds occasionally, but Plaintiff could rarely balance, stoop, kneel, or crawl.  Tr. 699. Dr. Rose found Plaintiff's ability to communicate was compromised, and his ability to follow complex instructions, to calculate, to read, or to make change was impaired.  Tr. 699.

In June 2010 Plaintiff was examined by Kenneth Milsap, a nurse practitioner, and Donald Ross, M.D., a neurosurgeon, at the request of Dr. Robertson.  Dr. Ross noted Plaintiff demonstrated Waddell signs potentially signaling exaggeration of symptoms.  Dr. Ross diagnosed Plaintiff with low-back and bilateral lower-extremity radicular symptoms and bilateral L5 foraminal stenosis with loss of disc height in the L5-S1 level. Tr. 723.

On the basis of the medical evidence the ALJ found Plaintiff had severe impairments of mild degenerative disc disease of the lumbar spine with chronic lumbar strain, moderate cervical degenerative disc disease as of May 2012, and left-shoulder impingement.  Tr. 13.

**V.  Evidence from Dr. Col, Examining Psychologist**

On April 17, 2009, Plaintiff was evaluated by Dr. Col to determine whether Plaintiff has psychological issues that make it difficult for him to function.  *See, e.g.*, Tr. 547.  Dr. Col noted Plaintiff's actions "immediately suggested the possibility of some sort of intellectual disability." Tr. 556.  To evaluate Plaintiff's mental health Dr. Col conducted a clinical interview; a physical examination; the Wechsler Adult Intelligence Exam, Third Edition, (WAIS-III); and the Adaptive Behavioral Assessment System, Second Edition, (ABAS-II). Tr. 547-48.

Dr. Col noted Plaintiff's examination scores were internally consistent and also consistent with Plaintiff's work and family history, functional limitations, and the clinical interview and physical examination.

> [Plaintiff] was able to pay attention and stay on task during his interview and subsequent testing, though his general fund of knowledge appeared to be somewhat deficient.  He seemed capable of reasoning. Insight and judgment were not evaluated. His mood was euthymic during his interview with no significant alterations, fluctuations or dissonances in his affect. He appeared to give his best effort on all tasks, and the current measures of his abilities, strengths, and weaknesses appear to be both valid and accurate. . . .  There were no statistically significant

                    differences between any of [Plaintiff's]
                    Index, IQ, or individual subtest scores.

Tr. 556-57.  Plaintiff's scores on the Weschler Adult

Intelligence Scale III revealed a Full-Scale IQ of 63 with all

of his IQ and Index scores falling in the extremely low range

between 63 and 69.  Tr. 556.  Thus, Dr. Col diagnosed Plaintiff

with "mild mental retardation."  Tr. 554.

     As noted, Dr. Col also conducted the Adaptive Behavior

Assessment, Second Edition (ABAS-II).  Plaintiff's composite

scores were all in the extremely low range, and his overall

score was 62, which Dr. Col described as "virtually identical"

to his result on the WAIS-III.  Tr. 557.  Dr. Col's medical

opinion on the basis of these tests was that Plaintiff would

have "'marked' to 'extreme' levels of dysfunction."  Tr. 686.


                              **DISCUSSION**

     Plaintiff contends the ALJ erred at Step Three when (1) the

ALJ discounted evidence from Dr. Col and (2) when the ALJ

concluded Plaintiff does not meet the criteria of Listing

12.05(c).  Plaintiff asks the Court to reverse the ALJ's

decision and to remand this case for the immediate calculation

of benefits.  Although the Commissioner concedes the ALJ erred

by improperly discounting medical evidence from Dr. Col, the

20 - OPINION AND ORDER

Commissioner asserts the Court should remand the case for further administrative proceedings.

Plaintiff also contends the ALJ erred by failing to sufficiently credit the opinion of Dr. Fernstrom, by failing to sufficiently credit the opinion of Dr. Rose, and by finding Plaintiff retains the ability to perform other work in the national economy. The Court, however, does not need to reach these issues because the Court ultimately finds Plaintiff's impairments meet the criteria of Listing 12.05(c) and, therefore, concludes Plaintiff is disabled and entitled to benefits.

The Court notes there is some ambiguity in the record as to the basis of the ALJ's determination that Plaintiff doesn't meet the requirements of Listing 12.05(c). At times the ALJ appears to rely on his reasons for giving Dr. Col's opinion "little weight" and finding Plaintiff's test scores "belie[d]" by other evidence. Tr. 15. At other times the ALJ appears to view Plaintiff's "mild mental retardation" as medically established but insufficient to meet the requirements of Listing 12.05(c):

> "[W]hile the record documents verbal, performance, or full scale IQ scores between 60 and 70 and physical impairments that impose additional and significant work-related functional limitation, the evidence of record does not establish that his mental

impairment has caused deficits in adaptive
functioning."

Tr. 15.  This ambiguity aligns with Plaintiff's assertions that

the ALJ erred at Step Three by incorrectly discounting Dr. Col's

medical opinion and Plaintiff's test scores or by misapplying

the requirements of Listing 12.05(c).

**I.   The ALJ erred by discounting Dr. Col's opinion.**

The ALJ erred when she gave "little weight" to Dr. Col's

opinion that Plaintiff's adaptive functioning abilities "were

all in the Extremely Low range" and when she found other

evidence "belies" Plaintiff's test results.  Tr. 15.

> **A.   To reject uncontradicted medical evidence properly, the
> ALJ must provide clear and convincing reasons based on
> substantial evidence in the record.**

Disability opinions are reserved for the Commissioner.  20

C.F.R. §§ 404.1527(e)(1), 416.927(e)(1).  The ALJ is responsible

for determining credibility, resolving conflicts in the medical

evidence, and resolving ambiguities.  *Vasquez v. Astrue*, 572

F.3d 586, 591 (9th Cir. 2009).  The ALJ may reject physicians'

opinions that are "brief, conclusory, and inadequately supported

by clinical findings."  *Bayliss v. Barnhart*, 427 F.3d 1211, 1216

(9th Cir. 2005).  The court must weigh all of the evidence

whether it supports or detracts from the Commissioner's

decision.  *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th

Cir. 2008).  Even when the evidence is susceptible to more than
one rational interpretation, the court must uphold the
Commissioner's findings if they are supported by inferences
reasonably drawn from the record.  *Ludwig v. Astrue*, 681 F.3d
1047, 1051 (9th Cir. 2012).  The court may not substitute its
judgment for that of the Commissioner.  *Widmark v. Barnhart*, 454
F.3d 1063, 1070 (9th Cir. 2006).

If a treating or examining physician's opinion is not
contradicted by another physician, the ALJ must provide clear
and convincing reasons for rejecting that opinion.  *Orn v.
Astrue*, 495 F.33d 625, 632 (9th Cir. 2007)(treating physician);
*Widmark v. Barnhart*, 454 F.3d 1063, 1067 (9th Cir. 2006)
(examining physician).

**B.  The ALJ did not provide legally sufficient grounds for
discounting Dr. Col's opinion.**

The record reflects Dr. Col's opinion is not contradicted
by any other examining psychologist or psychiatrist.  The ALJ,
therefore, may not reject Dr. Col's opinion and his conclusions
as to Plaintiff's test scores without providing clear and
convincing reasons based on substantial evidence in the record
for doing so.  The ALJ provided the following reasons for
rejecting Dr. Col's opinion and his conclusions as to
Plaintiff's test scores:  (1) Dr. Col's opinion is based on

generalizations about individuals with disabilities, (2) it is
inconsistent with Plaintiff's marital history and status as a
father, (3) it is inconsistent with Plaintiff's work history,
and (4) it is inconsistent with the Third Party Function Report
on Plaintiff's abilities.

**1.    The ALJ erred when she discounted Dr. Col's
opinion on the ground that it is based on
generalizations about individuals with disabilities.**

The ALJ gave little weight to Dr. Col's opinion on the
ground that it "relies on generalizations about 'individuals
with intellectual disabilities' that do not necessarily apply to
Mr. Bailey." Tr. 15.  Dr. Col, however, based his evaluation
and diagnosis of Plaintiff on a clinical interview, a physical
examination, and objective medical tests.  Tr. 547-58.  The
Court, therefore, concludes this basis for rejecting Dr. Col's
opinion is without merit.

**2.    The ALJ erred when she found Plaintiff's marital
history is inconsistent with Dr. Col's opinion.**

The ALJ also gave little weight to Dr. Col's opinion
based on Plaintiff's marital history and status as a father,
which the ALJ found "reasonably suggests" Dr. Col incorrectly
described Plaintiff's actual level of adaptive functioning.
Tr. 15.  The record indicates Plaintiff has been married twice
and has fathered two children.  There is not, however, any

evidence in the record that indicates Plaintiff functioned as a husband or father in a way incompatible with a diagnosis as mentally handicapped. *See* Tr. 687. The record also reflects Dr. Col was aware of Plaintiff's marital history and status as a father and incorporated these facts in his diagnosis. Tr. 547-58, 686-87. The Court, therefore, concludes this basis for rejecting Dr. Col's opinion is without merit.

### 3. The ALJ erred when she found Plaintiff's employment history is inconsistent with Dr. Col's opinion.

The ALJ also gave little weight to Dr. Col's opinion on the basis that it is inconsistent with Plaintiff's work history; for example, that Plaintiff's "past work was not performed within a 'sheltered' workshop" and that Plaintiff reported he "supervised another employee." Tr. 15.

The record, however, reflects Plaintiff's first position was at Sunrise Enterprises, a "sheltered" workshop, and that Plaintiff was hired in a second position as a lumber stacker through Sunrise Enterprises. Tr. 69-70. Although the record contains a self-report in the form of a check-box from Plaintiff that indicates he supervised one person while working as a dishwasher, which might support an inference that Plaintiff is not mentally handicapped, the record also contains several detailed accounts of Plaintiff's interactions with his employer

indicating that management struggled to explain basic concepts
to him.  Tr. 299, 334-38, 352.  In any event, Dr. Col was aware
of Plaintiff's employment history and considered it in his
diagnosis.  Tr. 547-58, 686-87.  The Court, therefore, concludes
this basis for rejecting Dr. Col's opinion is without merit.

      **4.**    **The ALJ erred when she discounted Dr. Col's
opinion on the basis of the vague and contradictory
Third Party Function Report from Chad Mead.**

The ALJ also gave little weight to Dr. Col's opinion
based on the Third Party Function Report submitted by Chad Mead,
a friend of Plaintiff.  Tr 15, 439-46.  The ALJ characterizes
Mead's report as showing that Plaintiff can "independently
manage his personal care, prepare his own meals daily, perform
household chores, go outside daily, ride a bicycle, go fishing,
and manage his own finances."  Tr. 15.

The ALJ's characterization of the Third Party Function
Report selectively identifies information from the report.  The
report itself consists mostly of vague and inconsistent two- and
three-word phrases, and, taken as a whole, the report is as to
whether Mead is describing Plaintiff as mentally disabled.
Tr. 439-46.  For example, although Mead checked boxes indicating
Plaintiff is "able" to pay bills, to count change, to handle a
savings account, and to use a checkbook, he also describes
Plaintiff as sometimes needing help to shower or to bathe, being

limited to preparing "frozen food & sandwiches" that take up to five minutes to prepare, and liking to fish even though he is unable to do it well.   Tr. 440-43.

The Third Party Function Report is part of a record that contains reports from multiple doctors and third parties who describe Plaintiff as disheveled and poorly groomed (Tr. 470, 547, 697); as wearing soiled clothing (Tr. 697); as needing special reminders to comb his hair, wash his clothes, and to bathe (Tr. 287); and as unable to handle a savings account or checkbook (Tr. 288).

The Court concludes on this record that the inconsistent Third Party Function report, which contains some descriptions of Plaintiff that suggest he may be cognitively limited and other descriptions that suggest otherwise, does not constitute a clear and convincing reason for discounting Dr. Col's opinion that Plaintiff is mentally handicapped.

In summary, the Court concludes on this record that the ALJ erred when she gave little weight to Dr. Col's opinion because she did not provide legally sufficient reasons supported by substantial evidence in the record for doing so.

**II.   The ALJ erred when she found Plaintiff's impairments do not meet the requirements of Listing 12.05(C).**

As noted, at Step Three the ALJ determines whether the claimant's impairments meet or equal one of the listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity.   20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).   *See also Keyser*, 648 F.3d at 724.   At Step Three the ALJ found as follows: "[W]hile the record documents verbal, performance, or full scale IQ scores between 60 and 70 and physical impairments that impose additional and significant work-related functional limitation, the evidence of record does not establish that his mental impairment has caused deficits in adaptive functioning." Tr. 15.

**A.   Requirements of Listing 12.05(C)**

Listing 12.05 provides in relevant part:

> 12.05 Intellectual disability:  Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22.  The required level of severity for this disorder is met when the when the requirements in A, B, C, or D are satisfied.

* * *

28 - OPINION AND ORDER

> C.  A valid verbal, performance, or full
> scale IQ of 60 through 70 and a physical or
> other mental impairment imposing an
> additional and significant work-related
> limitation of function. . . .

The test for whether a claimant meets Listing 12.05(C) is whether a claimant demonstrates (1) a mental impairment shown by adaptive deficits with onset before age 22; (2) a valid verbal, performance, or full scale IQ of 60 to 70; and (3) a physical or other mental impairment imposing an additional and significant work-related limitation of function.  20 C.F.R. § Pt. 404, Subpt. P, App. 1, 12.05.  *See also Thresher v. Astrue*, 283 F. App'x 473 (9th Cir. 2008); *Pedro v. Astrue*, 849 F. Supp. 2d 1006, 1011 (D. Or. 2011).

To satisfy the first element of the test "[a] claimant may use circumstantial evidence to demonstrate adaptive functioning deficits, such as attendance in special education classes, dropping out of high school prior to graduation, difficulties in reading, writing or math, and low skilled work history." *Pedro v. Astrue*, 849 F. Supp. 2d 1006, 1011 (D. Or. 2011)(citing Campbell v. Astrue, No. 1:09-CV-00465GSA, 2011 WL 444783, at *17 (E.D. Cal. Feb. 8, 2011))(internal quotations omitted).

To satisfy the second element of this test, a claimant must show a valid verbal, performance, or full scale IQ of 60 to 70.

Although an ALJ may find an IQ score invalid, the ALJ may not find an IQ score valid and still find a claimant not qualified on the basis of claimant's level of functioning. "The listing does not speak to functioning—it speaks only to the IQ score itself." *Thresher v. Astrue*, 283 F. App'x 473, 475 (9th Cir. 2008).

If the ALJ finds the claimant has a "severe" additional mental or physical impairment, the impairment satisfies the third element of this test as "a significant work-related limitation of function" for purposes of Listing 12.05(C). 20 C.F.R. Pt. 404, Subpt. P., App. 1, § 12.00A. *See also Pedro v. Astrue*, 849 F. Supp. 2d 1006, 1011 (D. Or. 2011).

**B.   Plaintiff satisfies the requirements for Listing 12.05(C).**

Listing 12.05(C) requires onset of a claimant's mental impairment before age 22, which a claimant may show with circumstantial evidence of adaptive functioning deficits. As noted, Plaintiff has had special-education classes; has a history of low-skilled work; has consistently reported being a "slow-learner"; and is unable to drive, does not live independently, and is inconsistent in managing his hygiene. The claimant in *Pedro* graduated high school, was able to drive, lived independently, handled her own hygiene, and took care of

her children.   Nevertheless, the court found the claimant to
have "amply" demonstrated the onset of her mental handicap
before the age of 22 because she had taken special-education
classes, had a history of low-skilled work, and testified she
struggles with reading and writing.   "The listing does not
require more."   *Id.* at 1014.   On this record the Court concludes
Plaintiff has met the first element of the test for satisfying
the requirements of Listing 12.05(C).

The ALJ also found "the record documents verbal,
performance, or full scale IQ scores between 60 and 70."
Tr. 15.   As noted, the ALJ did not provide legally sufficient
reasons for rejecting these scores, and it is the scores
themselves that satisfy the second element.   On this record,
therefore, the Court concludes Plaintiff has met the second
element of the test for satisfying the requirements of Listing
12.05(C).

As noted, at Step Two the ALJ found Plaintiff "has the
following severe impairments:   mild mental retardation; mild
degenerative disc disease of the lumbar spine, with chronic
lumbar strain; moderate cervical degenerative disc disease as of
May 2012; and left shoulder impingement."   Tr. 13.   The ALJ
found these impairments were "established by medically
acceptable clinical diagnostic techniques and significantly

limited [Plaintiff's] physical and mental ability to do basic work activities."  Tr. 14.  Because the ALJ found these physical impairments were "severe" under 20 C.F.R. §§ 404.1520(a)(4)(ii) and 416.920(a)(4)(ii), Plaintiff has a significant impairment resulting in a work-related limitation of function.  On this record, therefore, the Court concludes Plaintiff has met the third element of the test for satisfying the requirements of Listing 12.05(C).

In summary, the Court concludes Plaintiff has severe impairments that meet the requirements for Listing 12.05(C), and therefore, Plaintiff is disabled.


## REMAND

The decision whether to remand for further proceedings or for immediate payment of benefits generally turns on the likely utility of further proceedings.  *Harman v. Apfel*, 211 F.3d 1172, 1179 (9th Cir. 2000).  When "the record has been fully developed and further administrative proceedings would serve no useful purpose, the district court should remand for an immediate award of benefits."  *Benecke v. Barnhart*, 379 F.3d 587, 593 (9th Cir. 2004).

The decision whether to remand this case for further proceedings or for the payment of benefits is a decision within the discretion of the court.  *Harman*, 211 F.3d 1178.

The Ninth Circuit has established a three-part test "for determining when evidence should be credited and an immediate award of benefits directed." *Harman*, 211 F.3d at 1178.  The Court should grant an immediate award of benefits when:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting . . . evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Id.*  The second and third prongs of the test often merge into a single question:  Whether the ALJ would have to award benefits if the case were remanded for further proceedings.  *Id.* at 1178 n.2.

Here the Court has determined the ALJ erred when she gave little weight to the opinion of Dr. Col and in her application of Social Security Regulations at Step Three by finding Plaintiff does not have an intellectual disability and a significant physical impairment.  When the Court credits Dr. Col's opinion, Plaintiff's disability meets or exceeds the severity of disability of Listing 12.05(c).  Thus, the Court

33 - OPINION AND ORDER

concludes Plaintiff is disabled based on this record and that no useful purpose would be served by a remand of this matter for further proceedings.   *See Harman,* 211 F.3d at 117.

### CONCLUSION

For these reasons, the Court **REVERSES** the decision of the Commissioner and **REMANDS** this matter to the Commissioner pursuant to sentence four, 42 U.S.C. § 405(g), for the immediate calculation and payment of benefits to Plaintiff.

IT IS SO ORDERED.

DATED this 22nd day of July, 2015.


_____
ANNA J. BROWN
United States District Judge


34 - OPINION AND ORDER